834 F.2d 1297
 56 USLW 2348, RICO Bus.Disp.Guide 6800,
24 Fed. R. Evid. Serv. 254
 LIQUID AIR CORPORATION, Plaintiff-Appellee,
v.
Jack R. ROGERS, George Michlik and D & R Welding Supply
Company, an Illinois Corporation, and Raymond E.
Bridges and Bridges Welding Supply &
Therapy, Inc., Defendants-Appellants.
 Nos. 86-3001, 86-3046.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 2, 1987.
Decided Nov. 13, 1987.
As Amended on Denial of Rehearing and Rehearing En Banc Dec. 10, 1987.
 
 Frank H. Byers, II, Byers, Byers & Greenleaf, Ltd., William A. McNutt, Lowe, Moore, Susler, McNutt & Wrigley, Decatur, Ill., for defendants-appellants.
 William G. Schopf, Jr., Schopf & Weiss, Chicago, Ill., for plaintiff-appellee.
 Before BAUER, Chief Judge, COFFEY, Circuit Judge, and ESCHBACH, Senior Circuit Judge.
 BAUER, Chief Judge.
 
 
 1
 This case raises several issues with respect to civil enforcement of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1962 ("RICO"), including (1) what standard of proof should govern civil RICO actions; (2) whether a series of fraudulent acts in a single scheme, with a single victim, satisfies RICO's requirement of a "pattern of racketeering activity;" (3) to what degree may vicarious liability be imposed under civil RICO; (4) the appropriate measure of damages under RICO; and (5) whether any set-off should be subtracted before or after trebling the damage award under RICO. D & R Welding Supply Company ("D & R") leased compressed gas cylinders from Liquid Air Corporation ("Liquid Air"). Through a series of fraudulent shipping orders, D & R made it appear that it had returned over 3,000 cylinders to Liquid Air. A jury found all defendants guilty of civil RICO and pendent state torts. In addition to the RICO issues, defendants challenge the sufficiency of the evidence, various evidentiary rulings and various jury instructions. For the reasons that follow, we affirm the judgment entered in all respects.
 
 I.
 
 2
 D & R is an Illinois corporation in which two of the shareholders are Jack R. Rogers and George Michlik. D & R operates out of Decatur, Streator and Urbana, Illinois and is involved in interstate commerce. Among other supplies, it distributed compressed gas. In order to distribute the gas, D & R leased both compressed gas and compressed gas cylinders from Liquid Air. As a result of price increases, D & R gave notice that it would terminate its distributorship with Liquid Air, effective September, 1981. Under its Distributor Agreement with Liquid Air, D & R was required to return leased gas cylinders to Liquid Air, pay rent on outstanding cylinders and pay the replacement value for any cylinders not returned or accounted for. The monthly rental fee then in effect was $2.25 per cylinder; the average replacement cost per cylinder was $150.
 
 
 3
 D & R was slow in returning the cylinders after it terminated its distributorship. By August, 1982, D & R had returned only 1,570 of 5,000 outstanding cylinders. At this point, Liquid Air began to charge D & R its higher, nondistributor rental rate. Just after Liquid Air raised its rate, Michlik and Rogers became more creative in their business dealings. They enlisted the aid of Ray Bridges, an employee of Liquid Air responsible for handling all paperwork at Liquid Air's Peoria Distribution Center. Under the scheme, Bridges would falsify documents so that it would appear that D & R had returned all outstanding cylinders. D & R would thus save the rental and replacement fees while retaining the cylinders for its own use. The scheme was accomplished through nineteen separate falsified shipping orders documenting returns that had never been made. Each shipping order involved using the mails twice and one wire transfer.
 
 
 4
 In return for Bridges's "work", Michlik and Rogers arranged to set Bridges up in his own welding business in Peoria. They supplied Bridges with personnel, capital and welding products. Michlik and Rogers derived an additional benefit from this pay-off to the scheme. Michlik and Rogers were prevented from openly expanding their business into Peoria because of a non-competition agreement with A. W. Moore Welding in Peoria ("Moore Welding"). By setting Bridges up in the welding business in Peoria, Michlik and Rogers could not only bilk Liquid Air of its cylinders, but could also circumvent the non-competition agreement through their participation in Bridges Welding.
 
 
 5
 In August, 1983, Liquid Air employee Lauren "Bud" Sage became suspicious after hearing that Ray Bridges was seen removing Liquid Air cylinders from the Liquid Air Peoria Distribution Center, supposedly with Sage's okay. Sage initiated an investigation to determine whether D & R had actually returned the cylinders it had leased from Liquid Air. Sage compared Liquid Air's inventory of cylinders on paper to the physical inventory taken in Peoria for July, 1983. The comparison revealed a discrepancy of 3,307 cylinders between those that Liquid Air actually possessed and those that its internal documents registered.
 
 
 6
 On April 4, 1984, Liquid Air filed a five-count complaint against Michlik, Rogers, D & R, Ray Bridges and Bridges Welding Supply ("Bridges Welding"), which was amended in September, 1984 to include two additional counts. The complaint charged separate RICO violations of 18 U.S.C. Sec. 1962(a), (b), (c) and (d) (Counts I & II, III and IV); conversion (Count V); breach of fiduciary duty by Ray Bridges (Counts VI and IX); inducement to breach a fiduciary relationship by Michlik, Rogers and D & R (Count VII); and conversion of miscellaneous business supplies by Ray Bridges and Bridges Welding (Count VIII). The predicate acts for the RICO counts were mail fraud, 18 U.S.C. Sec. 1341, and wire fraud, 18 U.S.C. Sec. 1343.
 
 
 7
 The ensuing jury trial lasted approximately two and one-half weeks. The jury found against all the defendants on the RICO counts and on one count of conversion. In addition, the jury found that Ray Bridges had breached his fiduciary duty to Liquid Air in participating in the scheme and that Michlik, Rogers and D & R had induced the breach. The jury returned a verdict for defendant Ray Bridges on the breach of fiduciary duty and conversion associated with the miscellaneous missing business supplies. The jury assessed $750,000 in compensatory damages on all four RICO counts.[1] On the conversion count, the jury assessed $350,000 in actual damages and punitive damages in the following amounts: $25,000 against D & R; $15,000 against Bridges Welding; $10,000 against Rogers; $10,000 against Michlik; and $5,000 against Bridges. On the claim that Ray Bridges had breached his fiduciary duty, the jury assessed $4,000 in actual damages and $1,000 in punitive damages against Ray Bridges. For inducing Ray Bridges to breach his fiduciary duty, the jury assessed $750,000 in actual damages and $10,000 each in punitive damages against D & R, Michlik and Rogers. Sometime after the trial, the defendants returned 530 Liquid Air cylinders and the court ordered that the rental and replacement value of the 530 cylinders be subtracted from the total trebled damage award.
 
 
 8
 Defendants charge numerous bases for overturning the jury verdicts, which may be grouped as follows: (1) whether the district court used the proper standard of proof; (2) whether the evidence supports a finding that defendants engaged in a "pattern of racketeering activity;" (3) whether conspiracy is a proper basis for civil liability; (4) whether Bridges Welding was properly found vicariously liable for conversion or RICO; (5) whether the evidence was sufficient to support the adverse jury verdicts; (6) objections to various evidentiary rulings; (7) objections to various jury instructions; (8) damages. We address each of defendants' arguments in turn.
 
 II.
 RICO
 
 9
 The Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. Secs. 1961-1968 ("RICO"), was designed to prevent organized crime from gaining a stronghold in legitimate businesses. Statement of Findings and Purpose, Organized Crime Control Act of 1970, Pub.L. 91-452, 84 Stat. 922, 922-23 (1970). The Act prohibits various forms of infiltration of legitimate business "enterprises" involved in interstate commerce through a "pattern of racketeering activity." 18 U.S.C. Sec. 1962. Section 1964 of the Act provides for civil suits arising out of Sec. 1962 RICO violations.
 
 Standard of Proof
 
 10
 Defendants argue that civil RICO proceedings are quasi-criminal in nature, and that the court therefore should have imposed a higher standard of proof than a mere preponderance of the evidence. In Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court left undecided the question of the proper standard of proof to be used in civil RICO cases. Id. at 491, 105 S.Ct. at 3282-83. Still, there is a strong suggestion in Sedima that the appropriate standard of proof in civil RICO is proof by a preponderance of the evidence. The court noted:
 
 
 11
 We are not at all convinced that the predicate acts must be established beyond a reasonable doubt in a proceeding under Sec. 1964(c). In a number of settings, conduct that can be punished as criminal only upon proof beyond a reasonable doubt will support civil sanctions under a preponderance standard.
 
 
 12
 Id. Since Sedima, many lower courts have addressed the issue and have reached the conclusion that proof by a preponderance of the evidence is sufficient to establish a civil violation of section 1962. See Wilcox v. First Interstate Bank of Oregon, 815 F.2d 522, 531 (9th Cir.1987); Cullen v. Margiotta, 811 F.2d 698, 731 (2d Cir.), cert. denied, 476 U.S. 1140, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); Armco Industrial Credit Corp. v. SLT Warehouse Co., 782 F.2d 475, 480-81 (5th Cir.1986); United States v. Local 560, Int'l Bhd. of Teamsters, 780 F.2d 267, 279-80 n. 12 (3d Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); Ford Motor Co. v. B & H Supply, Inc., 646 F.Supp. 975, 1001 (D.Minn.1986); Bosteve, Ltd. v. Marauszwski, 642 F.Supp. 197, 202 n. 7 (E.D.N.Y.1986); Owl Constr. Co., Inc. v. Ronald Adams Contractor, Inc., 642 F.Supp. 475, 477 (E.D.La.1986); Platsis v. E.F. Hutton & Co., 642 F.Supp. 1277, 1309 (W.D.Mich.1986); Stainton v. Tarantino, 637 F.Supp. 1051, 1070 (E.D.Pa.1986).
 
 
 13
 The standard of proof in a given case "serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979). Because society has a deep interest in not imprisoning the innocent and because we recognize the stigma that attaches from a criminal conviction, we require the government to prove guilt beyond a reasonable doubt. Id. The requirement of proof beyond a reasonable doubt in a non-criminal case is extremely rare. See In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (juvenile delinquency adjudication requires proof beyond a reasonable doubt). Winship was based on the recognition that an accused in a juvenile delinquency proceeding faces the possibility of losing his or her liberty and the subsequent stigma of a criminal conviction. Id. at 367, 90 S.Ct. at 1074. Defendants argue that, like delinquency adjudications, civil RICO is quasi-criminal. This contention is without merit. A civil RICO defendant does not face imprisonment, nor does the defendant suffer the collateral consequences associated with conviction of a criminal offense. While a civil RICO defendant does face the opprobrium of being labeled a "racketeer," it is not sufficiently stigmatizing to warrant criminal protections.[2] See Sedima, 473 U.S. at 492, 105 S.Ct. at 3283 ("As for stigma, a civil RICO proceeding leaves no greater stain than do a number of other civil proceedings.")
 
 
 14
 The clear and convincing evidence standard is an intermediate standard of proof, requiring more than proof by a preponderance of the evidence but less than proof beyond a reasonable doubt. It is used in civil cases in which more is at stake than mere loss of money. See, e.g., Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (termination of parental rights); Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (civil commitment); Woodby v. INS, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (deportation); Chaunt v. United States, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960) (denaturalization). Under common law, allegations of fraud required proof of clear, cogent and convincing evidence, due to the fear that such claims could be fabricated easily. See Herman & MacLean v. Huddleston, 459 U.S. 375, 388 n. 27, 103 S.Ct. 683, 690 n. 27, 74 L.Ed.2d 548 (1983). Many states, including Illinois, require allegations of fraud to be proven by clear and convincing evidence. See, e.g., Nat'l Republic Bank of Chicago v. Nat'l Homes Construction Corp., 63 Ill.App.3d 920, 21 Ill.Dec. 80, 381 N.E.2d 15 (1978). Defendants argue that since mail and wire fraud furnish the predicate acts for the RICO violations, plaintiff should have to prove its allegations by clear and convincing evidence. We believe the argument is foreclosed by the Supreme Court's reasoning in Herman & MacLean v. Huddleston, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). In Huddleston, the Supreme Court declined to require proof by clear and convincing evidence in a civil securities action based on fraud. The Court noted:
 
 
 15
 The interests of defendants in a securities case do not differ qualitatively from the interests of defendants sued for violations of other federal statutes such as the antitrust or civil rights laws, for which proof by a preponderance of the evidence suffices. On the other hand, the interests of plaintiffs in such suits are significant. Defrauded investors are among the very individuals Congress sought to protect in the securities laws. If they prove that it is more likely than not that they were defrauded, they should recover.
 
 
 16
 Id. at 390, 103 S.Ct. at 691-92. Although addressed to a different area of law, the reasoning of Huddleston is wholly applicable to the standard of proof issue in civil RICO cases. We can discern no reasoned basis for distinguishing a federal securities claim based on fraud from a civil RICO claim based on fraud as to warrant applying different standards of proof. Federal causes of action based on fraud which violates federal statutes are not to be governed by the State's standard of proof for common law fraud. The mere presence of a treble damages provision does not mandate otherwise. See Ramsey v. United Mine Workers, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971) (preponderance standard governs civil antitrust actions). Accordingly, we find that proof by a preponderance of the evidence is sufficient for a finding of liability under civil RICO.
 
 Pattern of Racketeering Activity
 
 17
 Defendants contend that the proven acts do not amount to a pattern of racketeering activity under RICO. Defendants were found liable under subsections 1962(a), (b), (c), and (d).[3] All subsections require the plaintiff to show that defendants engaged in a pattern of racketeering activity. A pattern of racketeering activity requires at least two acts of racketeering activity within ten years. 18 U.S.C. Sec. 1961(5). Racketeering activity includes mail and wire fraud, 18 U.S.C. Secs. 1341, 1343. 18 U.S.C. Sec. 1961(1). Plaintiff alleged that defendants engaged in a pattern of racketeering activity through fifty-seven separate acts of mail and wire fraud over a seven month period,[4] injuring both Liquid Air and Bridges Weldings's unwitting competitor, Moore Welding.
 
 
 18
 In Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court noted that a pattern of racketeering activity required more than just two acts committed within a ten year period; the acts must have "continuity plus relationship which combines to produce a pattern." Id. at 496 n. 14, 105 S.Ct. at 3285 n. 14. Borrowing from another statute, the Court defined "pattern" as "criminal acts that have the same or similar purposes, results, participants, victims or other methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. Since Sedima, courts have wrestled with defining the concept of a pattern under RICO.
 
 
 19
 Some courts required the predicate acts be part of two separate schemes before a pattern could be shown, see Superior Oil Co. v. Fulmer, 785 F.2d 252 (8th Cir.1986); others had determined that a single scheme or episode was sufficient, Bank of America v. Touche Ross & Co., 782 F.2d 966 (11th Cir.1986). In Morgan v. Bank of Waukegan, 804 F.2d 970 (7th Cir.1986), we opted for a "middle course between th[e] two extremes," requiring the predicate acts to be "ongoing over an identifiable period of time so that they can fairly be viewed as constituting separate transactions." Id. at 975. In determining whether the predicate acts are sufficiently continuous and related, we urged courts to examine the following factors: the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries. Id. at 975. We noted however that "the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement." Id. at 975-76. Thus, Morgan envisioned a fact-specific inquiry, in which no single factor would be determinative. Marshall & Ilsey Trust Co. v. Pate, 819 F.2d 806, 809-10 (7th Cir.1987). In Lipin Enterprises v. Lee, 803 F.2d 322 (7th Cir.1986), however, we noted that a single fraudulent scheme with one injury to one victim was not transmuted into a federal case simply because it required several acts of mail and wire fraud to inflict the single injury. Accord, Marks v. Pannell Kerr Forster, 811 F.2d 1108 (7th Cir.1987).
 
 
 20
 Plaintiffs allege that defendants defrauded two victims: Liquid Air and Moore Welding. Although setting Bridges up in business was undoubtedly part of the scheme (the payoff), Moore was not injured as a direct result of any of the predicate acts. Moore Welding was injured when D & R chose to pay Bridges by circumventing their non-competition agreement. Circumventing the agreement was not an alleged predicate act under RICO. Thus, for the purpose of establishing a pattern of racketeering activity, Moore Welding is not a victim. Therefore, we have a single scheme which lasted seven months and defrauded a single victim. The defendants committed nineteen separate acts, each resulting in use of the mails and use of the wire service. Each time an invoice was falsely prepared, it deprived Liquid Air of its entitlement to rent or replacement value. Therefore, each act resulted in a distinct injury to Liquid Air and a concommitant benefit to D & R. We find that the repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO. Accord, Sun Savings & Loan Ass'n v. Dierdorff, 825 F.2d 187 (9th Cir.1987).
 
 Sufficiency of the Evidence
 
 21
 The defendants argue that the evidence was insufficient to prove that D & R did not actually return the 3,307 cylinders missing from Liquid Air's Peoria facility. A jury verdict will be upheld "if a reasonable basis exists in the record to support the verdict." Hamilton v. Svatik, 779 F.2d 383, 388 (7th Cir.1985). Defendants argue that Liquid Air used a flawed equation to determine that its paper inventory exceeded its actual inventory by more than 3,000. Testimony at trial showed that Liquid Air may not have counted "scrap" cylinders in assessing the actual inventory. Defendants postulate that the ignored "scrap" cylinders may have been cylinders returned from D & R that were later transferred to a different Liquid Air facility and "exchanged" for scrap cylinders. Defendants also argue that, according to their calculations, only 2,681 cylinders were not returned. Defendants merely present a plausible theory that the jury rejected. This is not a legitimate basis for overturning a jury verdict if the evidence was sufficient to support an opposing theory.
 
 
 22
 The jury had sufficient evidence to support its finding that D & R never returned 3,307 cylinders. Liquid Air employee Bud Sage testified extensively regarding his method of determining the number of stolen cylinders. Sage's calculations supported a determination that 3,307 cylinders were missing. Challenges to the calculations used go only to the weight to be accorded the testimony, a matter solely for jury determination.
 
 
 23
 In addition, the evidence was more than sufficient to show that D & R actually falsified the shipping orders. The evidence showed various irregularities associated with the orders documenting D & R returns supposedly made between November, 1982 and June, 1983. While prior to November, 1982, returns were signed only by D & R's regular drivers--and never by management--after November 1982, all but two return orders were signed by D & R management. In addition, the number of cylinders returned per order tripled during the period in question. No employee of either Liquid Air or D & R could be found who had seen any of these returns. Perhaps more importantly, defendants offered implausible explanations for these irregularities. The defendants testified that the returns were made when no other employees were around (except Bridges). This was directly contradicted by Liquid Air's employee time records. Bridges then explained that, in fact, the deliveries were made on days other than the date on the order because the orders were prepared either later or earlier and either post-dated or predated accordingly. This explanation was itself contradicted by further evidence of employee time records and Liquid Air's (and Bridge's) policy of using the actual date on the order form. Defendants contradicted themselves and each other. From all this, the jury was entitled to infer that D & R had falsified return orders and had wrongfully retained the missing 3,307 Liquid Air cylinders.
 
 Conspiracy
 
 24
 Defendants also challenge the jury's adverse finding with respect to the conspiracy count, section 1962(d). Defendants argue that there can be no civil liability based on conspiracy since there is no damage to plaintiff caused by the conspiracy alone. We need not reach either issue. The jury awarded $750,000 on each RICO count to be trebled. Were we to decide the conspiracy issues in defendants' favor, it would not lessen the amount of compensation they must pay. Accordingly, we decline to address either issue. Cf. Spanish Action Comm. of Chicago v. City of Chicago, 766 F.2d 315, 321 (7th Cir.1985) (declining to consider plaintiffs' additional challenge where it would not increase amount of recovery).Liability of Bridges Welding
 
 
 25
 Bridges Welding argues that it could not be liable for any RICO violation or for conversion since it did not have a corporate existence during the scheme. Bridges Welding was incorporated in April, 1983. Defendants' scheme was not completed until the end of May, 1983. Ray Bridges was a principal employee and president of Bridges Welding while still employed at Liquid Air. A corporation may be a "person" under RICO.[5] 18 U.S.C. Sec. 1961(3); Haroco v. Am. Nat'l Bank & Trust Co. of Chicago, 747 F.2d 384, 400 (7th Cir.1984), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). A corporation acts only through its agents. Under general agency rules, a corporation (principal) will be vicariously responsible for the wrongful acts of its employees (agents) when the acts are: (1) related to and committed within the course of employment; (2) committed in furtherance of the corporation; and (3) authorized or subsequently acquiesced in by the corporation. 10 W. FLETCHER, Cyclopedia of the Law of Private Corporations, Sec. 4942 at 620-21. In falsifying returns, Ray Bridges acted as president of Bridges Welding and his acts redounded to the benefit of Bridges Welding shareholders. Bridges Welding accepted the benefits of Ray Bridges's wrongdoing. The jury was entitled to infer acquiescence.
 
 
 26
 Vicarious liability, however, has only limited application to civil RICO to avoid holding vicariously liable a corporation that was the victim of a RICO violation. See Parnes v. Heinold Commodities, Inc., 548 F.Supp. 20, 23-24 (N.D.Ill.1982). To the extent that agency rules would require holding a legitimate, infiltrated business vicariously liable, the rules are at odds with the clear congressional intent to protect such legitimate businesses. See Haroco, 747 F.2d at 400. To accommodate these concerns, we have noted that the doctrine may apply only when 1) the corporation has derived some benefit from the RICO violation and 2) imposing vicarious liability is not inconsistent with the intent of Congress. To assess the intent of Congress we look to the express language of the particular subsections. Id. A RICO violation requires proof that a "person" (the defendant) acted with respect to an "enterprise" (the corporation) through a pattern of racketeering activity. If the language of the subsections require that the "person" and the "enterprise" be distinct entities, then we can postulate that Congress intended that "enterprises" not be held vicariously liable as defendants. In this regard, we have noted a distinction between subsections (a) and (c). Subsection (a) prohibits a person from investing money received from a pattern of racketeering in an enterprise engaged in interstate commerce. In Haroco, we noted that there was nothing in the language of subsection (a) that seemed to require that the liable "person" be a distinct entity from the "enterprise." In other words, subsection (a), by its express language, encompassed circumstances under which the enterprise itself was guilty of wrongdoing. Thus, vicarious liability under subsection (a) is consistent with congressional intent, provided the corporation derived some benefit from the RICO violation.
 
 
 27
 In contrast, the express language of subsection (c) has been read to proscribe vicarious liability. Haroco, 747 F.2d at 400; Parnes v. Heinold Commodities, Inc., 548 F.Supp. 20, 23-24 (N.D.Ill.1982). Subsection (c) prohibits an employee of an enterprise from operating the enterprise through a pattern of racketeering activity. We noted in Haroco that the language of subsection (c) clearly envisioned that the "person" (employee) and "enterprise" (employer) be different entities. Accord Petro-Tech, Inc. v. Western Co. of N. Am., 824 F.2d 1349 (3d Cir.1987) (finding that subsection (c) was intended to govern only those situations in which the enterprise was the passive, innocent victim of RICO). Thus, vicarious liability should not be imposed under subsection (c) when a finding of liability would require the "person" and "enterprise" to be the same entity.
 
 
 28
 Subsection (b) prohibits a person from acquiring an interest in an enterprise through a pattern of racketeering activity. Whether a single entity may be both a liable "person" and an "enterprise" under subsection (b) depends on whether the language of subsection (b) is more like (a) or (c). In Bruss Co. v. Allnet Communication Services, Inc., 606 F.Supp. 401 (N.D.Ill.1985), the court found that subsection (b), like subsection (c), required that the "person" and "enterprise" be distinct, reasoning that (b) requires the person to "acquire or maintain" an interest in an enterprise--similar to the requirement of subsection (c) that the person be "employed by" an enterprise. We disagree. Subsection (a), which requires a person to invest income in an enterprise, does not require a separate entity for the "person" and the "enterprise." See Masi v. Ford City Bank & Trust Co., 779 F.2d 397, (7th Cir.1985). We can see no distinction between "investing in an enterprise" and "acquiring an interest in an enterprise" sufficient to require separate entities for a subsection (b) violation. Unlike subsection (c), which requires a relationship between the "person" and the "enterprise" (employer-employee), subsections (a) and (b) require only the use of an "enterprise" by a "person." Accordingly, we hold that, like subsection (a), subsection (b) does not require the existence of an enterprise separate and distinct from the person sought to be held liable. Accord, Wilcox, 815 F.2d at 529.
 
 
 29
 Respondeat superior is therefore entirely appropriate under both subsections (a) and (b), so long as Bridges Welding derived a benefit from the violations. There is substantial evidence that Bridges Welding benefitted from the RICO violation. In exchange for the "work" of Bridges Welding's president, D & R supplied Bridges Welding with the labor of defendant Rogers's son and defendant Michlik's nephew. A supplier of Bridges Welding, Gano Welding, billed D & R for supplies furnished to Bridges Welding. In addition, there was evidence of various "loans" from D & R to Bridges Welding on which D & R was, at best, not actively pursuing collection. Therefore, under both (a) and (b), Bridges Welding was properly found liable.
 
 
 30
 Again, since addressing the propriety of the finding of vicarious liability under subsections (c) (under which respondeat superior may not apply) or (d) (conspiracy to violate (a), (b), or (c)), would not affect the amount of Liquid Air's award, we decline to consider defendants' challenges to these findings. Cf. Spanish Action Comm., 766 F.2d at 321.
 
 III.
 EVIDENTIARY RULINGS
 
 31
 Defendants maintain that the trial court prevented them from presenting their theory of defense. Defendants sought to convince the jury that no fraud had in fact occurred and that Liquid Air brought suit only to remove a new competitor (D & R) from the market. Defendants complain that the court excluded evidence that showed that Liquid Air had offered to finance an attempted "buy out" of a D & R competitor and that Liquid Air had divulged business secrets of D & R, revealed during discovery, in contravention of a stipulation not to reveal such information. Defendants argue that these pieces of evidence would show Liquid Air's general malevolence toward D & R and Liquid Air's desire to drive D & R out of business.
 
 
 32
 The trial court has broad discretion in determining whether proffered evidence should be admitted or excluded. See, e.g., United States v. Garver, 809 F.2d 1291, 1297 (7th Cir.1987). Had the court admitted the excluded evidence, it would not be especially probative of the allegation that Liquid Air's true motives in bringing the suit were solely malevolent and that no fraud had occurred. The court excluded evidence of the alleged discovery abuse because the documents were not listed in the pretrial order, nor had the court been informed of them at any time prior to the proffer. In addition, the proffered evidence would delay the proceedings, requiring trial counsel's testimony and possibly substitution of counsel. We find no abuse of discretion in the court's determination that the relevance of the evidence was outweighed by the danger of confusion and undue delay. FED.R.EVID. 403.
 
 
 33
 Defendants next object to the testimony of Gregory Alexander. Alexander was Liquid Air's comptroller and testified to the fair market value of the cylinders as a basis for the jury's award on the conversion count.[6] Defendants argue that Alexander was not sufficiently qualified to give expert testimony under FED.R.EVID. 702, the trial judge has broad discretion and the determination will be affirmed unless it is "manifestly erroneous." United States v. Lundy, 809 F.2d 392, 394 (7th Cir.1987); see also United States v. Davis, 772 F.2d 1339, 1343-44 (7th Cir.), cert. denied, 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985).
 
 
 34
 As comptroller, one of Gregory Alexander's duties was to determine the value of cylinders to be acquired, both new and used. The defendants objected to Alexander's qualifications because he did not explain the procedures he used to determine market value nor the geographic locality of his expertise. The district court ruled that plaintiff had established an adequate foundation, and that any questions regarding Alexander's methodology or particular area of expertise were more appropriately addressed during cross-examination. This was hardly error. Experience and knowledge establish the foundation for an expert's testimony; the accuracy of such testimony is a matter of weight and not admissibility. See Robinson v. Watts Detective Agency, Inc., 685 F.2d 729, 739 (1st Cir.1982), cert. denied, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 and 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983).[7]
 
 IV.
 JURY INSTRUCTIONS
 
 35
 Next, defendants object to various jury instructions given by the district court. Defendants contend that the trial court's instructions defining "pattern of racketeering activity" and "association-in-fact" were erroneous. In addition, defendants object to the court's failure to administer special interrogatories offered by the defendants.
 
 
 36
 In judging a challenge to a particular jury instruction, we must determine only whether the instructions overall, conveyed the "correct message" to the jury. Wilk v. Am. Medical Ass'n, 719 F.2d 207, 218-19 (7th Cir.1983), cert. denied, 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). The trial judge informed the jury that in order to find a "pattern of racketeering activity," it must find,
 
 
 37
 [t]wo or more acts of racketeering activity which were related by a common scheme, plan or motive. It may not simply be a series of disconnected acts. Therefore, proof of two acts of racketeering activity, without more does not establish a pattern.
 
 
 38
 The instruction comports with the general requirements of the statute as interpreted since Sedima. Defendants object because the charge failed to advise the jury that there be "some continuing threat of racketeering activity." Defendants argue that the continuity requirement of Sedima mandates that there be a threat that defendants would engage in future acts of racketeering after completion of their scheme. This is an untenable interpretation of the requirement of continuity. The requirement of continuity was not intended to force a court to guess the likelihood of future criminal conduct nor was it intended to proscribe liability for completed schemes. Continuity refers instead to the duration of the predicate acts. The trial court was correct in refusing the proffered instruction.
 
 
 39
 Defendants next contend that the jury was not instructed that it must find the existence of an enterprise before imposing liability. We find defendants' objections obtuse. As to each RICO count, the court instructed the jury regarding each element of the subsection, including the enterprise requirement. The jury was instructed that it had to find that defendants had used income derived from a pattern of racketeering to invest in an enterprise (subsection a); acquired an interest in an enterprise through a pattern of racketeering (subsection b); and conducted the affairs of an enterprise through a pattern of racketeering (subsection c). Apparently, defendants object to the court's failure to specifically instruct the jury that it must find the existence of an enterprise. It is not necessary to give a proposed instruction "where the essential points are covered in another instruction." United States v. Hansen, 701 F.2d 1215, 1218 (7th Cir.1983). The instructions, as given, adequately informed the jury that the existence of an enterprise was essential to civil RICO liability.
 
 
 40
 Defendants also claim as error the court's failure to administer special interrogatories proffered by defendants. Although initially expressing an interest in administering special interrogatories, the trial court determined that they were not necessary in light of cautionary instructions already given. When the court made this determination, defendants made no argument to enlighten the trial court regarding the necessity of special interrogatories, even in light of the cautionary instructions given; nor do they make such argument here. Simply voicing a general objection is not sufficient. To preserve for review the issue of whether special interrogatories were required, defendants would have to have argued the issue below with specificity. See Sanchez v. Miller, 792 F.2d 694, 703 (7th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 933, 93 L.Ed.2d 984 (1987). Their failure to specify on appeal how the failure to administer special interrogatories prejudiced them compounds their error. We have considered the remainder of defendants' challenges to the jury instructions and find them to be similarly frivolous.
 
 V.
 DAMAGES
 
 41
 Defendants challenge the jury's damage awards on several bases, many of which are frivolous and will not be addressed here. The remaining challenges are: (1) that the appropriate measure of damages for the RICO counts was only the fair market value of the cylinders and not contractual damages; (2) that the measure of damages for inducement to breach a fiduciary duty should be limited to the disloyal employees's wages and benefits during the fraud; (3) that the award of prejudgment interest was improper; and (4) that the court should have subtracted any set-offs prior to trebling the awards.
 
 Appropriate Measure of Damages Under RICO
 
 42
 Plaintiff was awarded $750,000 on each RICO count to compensate it for both the replacement value and the lost rental value of the cylinders. The court allowed the jury to determine the appropriate measure of compensation by looking to the contract between Chemtron Corporation (the predecessor in interest to Liquid Air) and Decatur Oxygen Products, Inc. (a wholly owned subsidiary of D & R), which provided that D & R would pay Liquid Air rent on all cylinders until they were returned or accounted for, and that D & R would pay Liquid Air the replacement value for any cylinders not returned. Defendants argue that contract damages were inappropriate and that under civil RICO, a court must look to the underlying nature of the predicate acts to determine the proper measure of damage. Since the underlying claim here is conversion, defendants argue, under Illinois law the appropriate measure of damages is only the fair market value of the cylinders. We have noted how futile it can be to employ a case-by-case approach in determining the "underlying" cause of action in civil RICO. See Tellis v. United States Fidelity & Guaranty Co., 805 F.2d 741 (7th Cir.1986), vacated, --- U.S. ----, 107 S.Ct. 3255, 97 L.Ed.2d 755 (1987). Although defendants now insist that the "underlying" cause of action is conversion, they insisted as strongly that the "underlying" cause of action was fraud in arguing for a "clear and convincing" standard of proof.
 
 
 43
 The measure of damages under civil RICO is the harm occasioned as a result of the predicate acts. Sedima, 473 U.S. at 497, 105 S.Ct. at 3286. A plaintiff injured by civil RICO violations deserves a "complete recovery." Carter v. Berger, 777 F.2d 1173, 1176 (7th Cir.1985). Although the contract only bound D & R and Liquid Air, the damages provided therein supply an appropriate measure of the degree to which Liquid Air was injured by the RICO violations. To restrict damages to the fair market value of the cylinders would deprive Liquid Air of its rights under the contract and would not compensate it for its losses. The damages that Liquid Air was entitled to under its contract with D & R provide the appropriate measure of full compensation.
 
 Lost Rent
 
 44
 Defendants then challenge the jury's award of lost rent, also provided for in the contract. Defendants equate lost rent with lost profits and note that Illinois does not allow recovery for lost profits in contract actions. The argument ignores the obvious distinction between lost rent and lost profits. Lost profits are not recoverable simply because they are speculative. The rent awarded was that due and owing at the time of conversion, and easily calculable. It was entirely appropriate to award lost rent.
 
 Set-off
 
 45
 Plaintiffs first learned during discovery that D & R retained some Liquid Air cylinders. At that time, Liquid Air sought a protective order over the cylinders (then thought to number around 200) to ensure their preservation. After post-trial motions were denied, defendants revealed that they had 530 Liquid Air cylinders, and sought to return them and accordingly set-off the judgment. The rental and replacement value of the belatedly returned cylinders was subtracted from the already trebled damages. Defendants argue that the cost of the returned cylinders should have been subtracted before trebling.
 
 
 46
 While the return of the cylinders may compensate Liquid Air for the replacement value of the cylinders, it does not compensate it for rents lost prior to litigation. More importantly, it does not negate the frauds perpetrated by defendants. We conclude that setting-off damages after trebling is more likely to effectuate the purposes behind RICO.[8] See, In re Nat'l Mortgage Equity Corp., 636 F.Supp. 1138, 1151 (C.D.Cal.1986); cf. Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir.) cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957) (subtracting set-off after trebling in antitrust case).
 
 
 47
 The judgment entered on the jury verdict and award of damages is affirmed in all respects.
 
 
 
 [1]
 Liquid Air's actual recovery was limited to the greatest single recovery under any one count, i.e., treble damages under any of the RICO counts
 
 
 [2]
 For the same reasons, we find no error in the district court's denial of defendants' motion for all rights afforded criminal defendants
 
 
 [3]
 Sec. 1962. Prohibited activities
 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, or use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern of racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.
 (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (1)(a), (b), or (c) of this section.
 
 
 [4]
 Plaintiffs proved that the defendants prepared nineteen fraudulent returns. Each return resulted in two acts of mail fraud and one act of wire fraud
 
 
 [5]
 Sec. 1961. Definitions
 (3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;
 
 
 [6]
 As opposed to the RICO counts, damages for conversion are properly limited to the fair market value of the converted items. People v. Rose, 19 Ill.2d 292, 166 N.E.2d 566 (1960)
 
 
 [7]
 Defendants also object to the trial court's refusal to allow defendants to explain the treble damage provision of RICO to the jury. Such information is irrelevant to a jury's deliberations and may confuse or prejudice the jury. It is properly excluded. Cf. Heatransfer Corp. v. Volkswagenwerk A.G., 553 F.2d 964 (C.A.Tex.1977), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792
 
 
 [8]
 Defendants challenge the treble damages provision of RICO as violative of the Eighth Amendment's proscription against excessive fines. The argument has been flatly rejected with respect to antitrust treble damages. See Berkey Photo, Inc. v. Eastman Kodak Co., 457 F.Supp. 404, 440 (S.D.N.Y.1978), rev'd on other grounds, 603 F.2d 263 (2d Cir.1979). The same reasoning applies here. Although there is some sense in which RICO treble damages are punitive, they are largely compensatory in the special sense that they ensure that wrongs will be redressed in light of the recognized difficulties of itemizing damages. See Carter v. Berger, 777 F.2d 1173 (7th Cir.1985)