Barry RICHARDS, Karen Richards, Roland Pepin, et al., Plaintiffs–Appellants,

v.

COMBINED INSURANCE COMPANY OF AMERICA and Credit Life Insurance Company of Ohio, Defendants–Appellees.

No. 94–1038.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1994.

Decided May 11, 1995.

Kristi L. Browne, Lawrence Walner, Julie Murphy Jaeger, Walner & Associates, Daniel A. Edelman (argued), Cathleen M. Combs, J. Eric Vander Arend, Michelle A. Weinberg, Edelman & Combs, Chicago, IL, Edward K. O'Brien, Needham, MA, for plaintiffs-appellants.

Kirk D. Messmer (argued), Kenneth T. Lopatka, Matkov, Salzman, Madoff & Gunn, Chicago, IL, for defendants-appellees.

Before ESCHBACH, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

Barry and Karen Richards and other plaintiffs (collectively "plaintiffs") brought this action against defendant Credit Life Insurance Company of Ohio ("Credit Life") and its parent corporation, Combined Insurance Company of America ("Combined"). They alleged that the defendants had a practice of keeping unearned insurance premiums that should have been refunded after the plaintiffs had made early loan payoffs or otherwise had terminated their policies. The district court granted summary judgment in favor of the defendants. The plaintiffs now appeal that judgment. For the reasons set forth below, we affirm.

## I

## BACKGROUND

### A. Facts

When the plaintiffs[1] obtained loans from the finance company Advanced Financial Services, Inc. ("Advanced"), they were required to purchase credit life and disability insurance coverage for the term of the loan. The insurance offered to them by Advanced was issued by the defendant Credit Life. At the time plaintiffs procured their loans, they paid the entire premium for the insurance. Several days later, they received an insurance certificate from Credit Life which stated the terms of their insurance coverage.[2] This certificate provided that the company would promptly refund any unearned premium if the loan was paid off early.[3] However, the insurance certificate did not state or require that the insured file any notification in order to receive a refund of the unearned premium. The plaintiffs allege that many borrowers did not receive a credit or rebate

---

[1] The complaint listed five plaintiffs, Barry Richards, Karen Richards, Roland R. Pepin, Sharon Kay Pepin, and Linda L. DeCicco, and thirteen other "victims" not named as plaintiffs but "willing and able to join in this action." All are Massachusetts residents. Compl. ¶¶ 8–23.

[2] In their complaint and brief, the plaintiffs suggest that the defendants' alleged misrepresentation promising a prompt refund was made on both the application form and the certificate. Compl. ¶ 60(a) & (b). However, the promise at issue appears only in the certificate. See Compl. Exs. B, G. At oral argument, plaintiffs' counsel clarified that the documents at issue were the certificates. In this opinion, therefore, we refer only to the certificates.

[3] Two types of certificates were attached to the plaintiffs' complaints. The certificate received by plaintiffs Barry and Karen Richards stated:

Renewal or refinancing the debt: If the debt is renewed or refinanced:
1. the insurance under this certificate stops;
2. we will refund the unearned premium; and
3. the effective date of new insurance is the date the debt was first insured to the extent:

a. that the effective date affects the group policy; and
b. of the amount and term of the debt outstanding on the date of the renewal or refinancing.
Refunds: Any unearned premium:
1. will be computed by the Rule of Anticipation; and
2. will be promptly paid or credited to the insured.
No refund or credit shall be made if the amount is less than one dollar.
R.40, Am. Compl. at ¶ 60(a) & Ex. B. The certificate received by plaintiffs Roland and Sharon Pepin and Linda DeCicco stated:
WHEN INSURANCE STOPS—REFUNDS
This insurance stops when the Term of Insurance in the Schedule expires, or when your loan is paid off, renewed, refinanced or otherwise stops, whichever happens first. If your insurance stops before the Term of Insurance in the Schedule expires, you will promptly be given a refund or credit on your account of unearned premium. This refund or credit will be calculated using the Rule of Anticipation for decreasing life and disability. No refund or credit need be made if the amount to be refunded does not exceed $1.00.
R.40, Am. Compl. at ¶ 60(b) & Ex. G.

of their unearned premiums.[4]

The plaintiffs' complaint[5] alleged that the defendants maintained a system which permitted them to retain for long periods of time, or to keep altogether, the refund money to which they had no claim. They asserted that an insurance business that fails to make refunds to consumers with the expectation that many will not notice and claim their money is engaging in dishonest conduct. They further alleged that the defendants made extensive use of the mail and wire services to execute such a scheme and practice of unlawfully withholding unearned credit insurance premiums after the loan was paid off early, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).[6] ¶¶ 113–118. The complaint also included state law counts alleging violations of the Illinois Consumer Fraud Act, common law fraud, breach of contract, and unjust enrichment.

B. *RICO: The Relevant Statutory Provisions*

To succeed in establishing a cause of action under § 1962(c), the plaintiffs were required to establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3284–85, 87 L.Ed.2d 346 (1985); *McDonald v. Schencker,* 18 F.3d 491, 494 (7th Cir.1994); *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 386 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam). The definition of "racketeering" provided in the statute includes a number of state and federal offenses, among which are wire and mail fraud. 18 U.S.C. § 1961(1). The required "pattern" can be established by proof of at least two acts of racketeering activity within a ten-year period. 18 U.S.C. § 1961(5). "[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900–01, 106 L.Ed.2d 195 (1989) (citations omitted). The remedy for an injury to business or property caused by violation of § 1962 is a civil one: the recovery of treble damages plus costs and reasonable attorney's fees. 18 U.S.C. § 1964(c). Proof of liability is by a preponderance of the evidence. *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1019 (7th Cir.1992); *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1303 (7th Cir.1987), *cert. denied,* 492 U.S. 917 (1989); *Appley v. West,* 832 F.2d 1021, 1027 (7th Cir.1987).

The racketeering activity on which plaintiffs' complaint was premised was mail and wire fraud. *See* 18 U.S.C. §§ 1341, 1343. Such a RICO allegation requires that the plaintiffs establish that the defendant (1) has participated in a scheme to defraud and (2)

4. The amended complaint alleges that plaintiff Ms. DeCicco did not receive a refund. ¶ 94. However, the record reflects that Ms. DeCicco did receive and cash her refund check. R. 47, Rule 12(m) Stmt. ¶¶ 37–39; Ex. 4B, 7B–C. In their response to defendants' motion for summary judgment, plaintiffs agreed that Ms. DeCicco is not a proper plaintiff, and consented to her dismissal. R. 69 at 1 n. 1.

The complaint also alleges that the Richardses received a refund only "after suit was threatened." ¶ 83. The defendants responded that the Richardses received their check as soon as defendants knew they had prepaid, and cashed their refund check before this action was filed. R. 47, Rule 12(m) Stmt. ¶¶ 8–15; Ex. 4B. The plaintiffs admitted receiving and cashing the check, R. 69, Rule 12(n) Stmt., ¶¶ 14–15. However, they still claim that they were victims of the scheme to convert the unearned premiums because it took more than a year to receive a refund. R. 69, Resp. to Defs' SJ Motion at 6. In their reply brief, they recharacterized their claim: Anyone whose funds have been *detained* has a claim. Reply Br. at 17.

5. The complaint before the court is plaintiffs' amended complaint, filed September 28, 1993. A second amended complaint, filed October 21, 1993, is identical to the amended complaint filed the month before; it added only a request for injunctive relief in Counts I (RICO claim) and II (Illinois Consumer Fraud claim). Because the parties' references are to the first amended complaint, R. 40, we have followed course.

6. 18 U.S.C. § 1962(c) provides, in pertinent part:

It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

has mailed or knowingly has caused to be mailed a letter or other material for the purpose of executing the scheme. *McDonald,* 18 F.3d at 494. To support their RICO claim, therefore, these plaintiffs must demonstrate that Combined and Credit Life committed mail and wire fraud by establishing that the defendants knowingly schemed to defraud plaintiffs of their property and used the mail and wire services in furtherance of their scheme. *See Marcial v. Coronet Ins. Co.,* 880 F.2d 954, 958 (7th Cir.1989).

## C. *District Court Proceedings*

The district court granted summary judgment to the defendant insurance companies on Count 1, the RICO count, and dismissed the state law counts. The court considered the defendants' challenges to each element of § 1962(c), but focused its decision on the plaintiffs' failure to prove that the defendants committed the predicate acts of racketeering activity, namely a fraudulent scheme effectuated through use of the mail and wire services. It examined the complaint's allegation that the insurance documents misrepresented that, when a loan was paid off early, a refund of the unearned premium would be made without any action on the part of the insured. The court was of the view that "the language of those documents tends to indicate that the insurance company will make the refund and does not place a burden on the insured to take action to initiate the refund process." Mem. Op. at 7, 1993 WL 528043. Although the court agreed that the defendants were "prey[ing] upon consumers' inattention and consequent failure to seek refunds," it nevertheless concluded that RICO was not "the proper vehicle to right the wrongs done to Plaintiffs." *Id.* The court explained that the plaintiffs did not show that the defendants knowingly schemed to defraud the plaintiffs of their property by means of the mail or wire services. According to the court, the plaintiffs had alleged a scheme on the part of the defendants to convert the unearned premiums. Even though there was evidence of such a scheme, stated the court, conversion is not fraud:

> [W]e cannot mesh these findings with the conventional requirements of fraud: a material misrepresentation relied upon by the

plaintiff to his detriment. Plaintiffs state that the contents of the certificates of insurance are "not alleged to be fraudulent per se." Pl. Resp. to Motion to Dismiss, at 13–14. Plaintiffs reveal the flaw in their RICO theory in that same pleading: they state, *"The fraud complained of in this case is the conversion of the unearned premium upon loan payoff, not the sale of insurance and not informing the borrowers that a demand is required by defendants."* Pl. Resp. to Motion to Dismiss, at 13 (emphasis in original). Conversion is a tort distinct from fraud.... Moreover, in these sentences, Plaintiffs relinquish their claim that the representations that a refund would be made upon early pay-off were fraudulent. As much as we would like to punish Insurance Companies' reprehensible behavior, we cannot do so on a RICO mail or wire fraud theory where Plaintiffs relinquish their claim that a misrepresentation occurred.

Mem. Op. at 8 (footnote omitted). The court therefore granted summary judgment to the defendants on Count I and dismissed the remaining counts without prejudice.

## II

## DISCUSSION

We begin our analysis with an examination of the complaint. The crux of the plaintiffs' allegations is that the insurance forms do not explain how the insured gets a refund, and do not "require that the insured file anything to obtain a refund." Compl. ¶ 60(b). The complaint alleges that "[d]efendants knowingly and intentionally omitted to create any mechanism for keeping track of the holders of the loans," ¶ 73, and that they "willfully, knowingly, and recklessly operated in such a manner that the borrowers would not receive their refunds, which instead would be kept by the defendants." ¶ 76. The complaint also broadly stated that "defendants made extensive use" of the mails to further their fraudulent scheme, and listed these mailed documents: monthly finance reports, information on policy and premium allocation, and applications and certificates. Compl. ¶ 115. The complaint did not allege that the documents

were fraudulent; it did allege that, as a regular practice, the payoff statements "would not contain a credit for the unearned premium" and that the defendants "failed to apprise the borrowers of this information." ¶ 116. The pleading also presented a vague, generalized claim of wire fraud: "Defendants kept apprised of the finance companies' activities and sales performance by interstate telephone calls." ¶ 117. Many of these averments, especially the latter ones, are vague. There is no identification of specific fraudulent documents or activities. We need not decide definitively, however, whether the complaint, taken as a whole, fails the specificity standard of Federal Rule of Civil Procedure 9(b).[7] Even if the allegations of the complaint were to pass muster under the established standards for pleading in RICO cases, here the plaintiffs have had the opportunity to go beyond the allegations of their complaint, and therefore we must assess their allegations in terms of the criteria that govern the disposition of a summary judgment motion.

■ A district court grants summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An appellate court follows the same standard, *Appley*, 832 F.2d at 1025, because it reviews a grant of summary judgment de novo. *Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 38 F.3d 1429, 1435 (7th Cir.1994). All reasonable inferences regarding the facts must be drawn in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). If that nonmoving party fails to establish the existence of an element essential to his case, one on which he bears the burden of proof, summary judgment in favor of the moving party is proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Marcial,*

880 F.2d at 959. It is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment. Moreover, we are not required to draw every conceivable inference in favor of the nonmoving party. We ought to allow only those inferences that are reasonable and present a "sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

■ With these standards in mind, we now turn to the case before us. As we have noted already, in order to prevail, the plaintiffs have the burden of establishing that the defendants operated through a pattern of racketeering activity as that term is defined by the statute. In this case, the alleged racketeering activity is defendants' scheme to defraud and to deprive the plaintiffs of their refunds through use of the mails. The plaintiffs assert that "the guiding principle is simple: if a business routinely obtains or retains money that belongs to consumers, it must have an effective routine for returning the money to the consumers. Keeping the money with the expectation that the consumer will not notice is deceptive, dishonest and fraudulent." Appellants' Br. at 21. The essence of the plaintiffs' case is the allegation that the certificates fraudulently led the insureds to believe that credit or refund would be given automatically; the defendants nevertheless kept the victim's money. The complaint further alleged that the defendants sent a variety of documents through the mail which had the effect of delaying or preventing detection.

■ It is well established that the crime of mail fraud does not encompass all the strict requirements of common law fraud. As Justice White wrote for the Supreme Court in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), mail fraud

---

7. *See Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir.1994) (concluding that " 'loose references to mailings and telephone calls' in furtherance of a purported scheme to defraud will not do"); *Midwest Grinding Co.*, 976 F.2d at 1020 (affirming dismissal of RICO fraud allegations because plaintiffs failed to identify the time,

place, and content of the communications alleged to the predicate acts perpetrating the fraud); *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir.1991) (determining that district court properly dismissed complaint for failure to allege the specific content of any fraudulent statements or acts).

was meant to "reach any scheme to [defraud or] deprive another of money or property by means of false pretenses, representations, or promises." *Id.* at 27, 108 S.Ct. at 321. "[T]he words 'to defraud' in the mail fraud statute have the 'common understanding' of ' "wronging one in his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." ' " *Id.* (quoting *McNally v. United States,* 483 U.S. 350, 358, 107 S.Ct. 2875, 2880–81, 97 L.Ed.2d 292 (1987) (quoting in turn *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924))). Consequently, it is not necessary to establish, as it is in the case of common law fraud, that there was a misrepresentation of present fact. *McNally,* 483 U.S. at 359, 107 S.Ct. at 2881. It is necessary, however, to establish that there was a scheme to defraud. *United States v. Richman,* 944 F.2d 323, 332 n. 10 (7th Cir.1991). This requirement carries with it the necessity of establishing that the defendants had the intent to implement such a scheme. Without such an intent, there can be no mail fraud. *McDonald v. Schencker,* 18 F.3d 491, 495 (7th Cir.1994); *United States v. Walker,* 9 F.3d 1245, 1249 (7th Cir.1993), *cert. denied,* ― U.S. ――, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994); *United States v. Ashman,* 979 F.2d 469, 480 (7th Cir.1992), *cert. denied,* ― U.S. ――, 114 S.Ct. 62, 126 L.Ed.2d 32 (1993); *United States v. Dunn,* 961 F.2d 648, 650 (7th Cir. 1992).

Given these requirements, it was incumbent on the plaintiffs, faced with the defendants' summary judgment motion, to demonstrate that they would be able to place before a jury sufficient evidence of an intent to deceive to permit the jury to make such a determination by a preponderance of the evidence. It is at this point that the plaintiffs' case founders and, in our view, finally sinks. The record before us does not establish that the plaintiffs could meet their burden of proving at trial that the defendants engaged in such a scheme.

We turn first to the certificates themselves. As the parties agree, the certificates contain no misstatement of fact or intent.

They simply recite, among other terms usually found in such documents, that the insurance terminates upon payment of the note and that any unearned premium will be returned to the insured. Notably, one of the certificates addresses another contingency in which refund of the premium would be required, the suicide of the insured. Here as well, the question of notification of the defendants is not addressed, although it seems reasonable to assume that such notification would be necessary. The fact that the certificate requires the submission of proof of death or disability, the events against which the insurance is issued, hardly militates, as a practical matter, against such an interpretation. Another factor, internal to the certificates themselves, also ought to be noted. On each certificate, in prominent typeset, is the address of the company. The mechanics of notification are hardly made difficult. In short, when viewed in their entirety, the certificates do not provide evidence that they are instruments in a scheme to defraud. Like most instruments of the insurance industry, they could be better written. However, an implication of fraud on the basis of the documents themselves is a stretch that no reasonable jury could make, or ought to be allowed to make.

The transaction as a whole provides no greater assistance to the plaintiffs. The note signed by the plaintiffs included an acknowledgement on the part of the borrower that the lender could transfer the note. There is no evidence of record that, in the case of such a transfer, the subsequent payments of the note, including its accelerated retirement, could become known to the defendant in the absence of notification.

■ When we examine the record beyond the certificates and the transaction in question, there is really no evidence that would substantiate a finding on the part of a jury that the defendants had engaged in a scheme to defraud. Indeed, the record shows that unearned premiums had been paid every time the company was asked to return them. Such a track record does not bear directly, of course, on the issue of whether the defendants had taken steps to ensure that they were not asked. However, regular payment

in the course of doing business, with no sign of reluctance, certainly does not support the plaintiffs' theory that the defendants had adopted the business practice of keeping unearned premiums. The evidence of record shows only that the defendants said that they would return the premium and that they did return premiums. Such evidence hardly supports a case for mail fraud and certainly does not support one for RICO. Indeed, at bottom, all the plaintiffs can show are several clauses in the defendants' insurance certificates that arguably could use a massage by an English teacher and/or a lawyer with superior drafting skills. Mediocre or sloppy business practices, without the requisite intent to defraud, will not support an allegation of mail fraud.[8]

In short, the plaintiffs' case went past the stage at which the only issue was the adequacy of the complaint. The district court entered its judgment after it had granted a motion for summary judgment. The plaintiffs were unable to meet the burden imposed on the nonmoving party at that stage in the litigation. Without evidence of the defendants' fraudulent intent, the plaintiffs' showing that the certificates contained no procedures for the automatic return of refunds possibly might amount to negligence, but it is not fraud. Without "any acts of deceit or chicanery on the part of [defendants] which would give rise to a scheme to defraud for the purposes of mail fraud," *McDonald,* 18 F.3d at 495, we cannot find a violation of § 1962(c) of the RICO statute.

### Conclusion

For the foregoing reasons, we concur that summary judgment on the RICO claim was appropriate. Because federal jurisdiction was based upon that RICO claim, the district court properly exercised its discretion in dismissing the supplemental state claims. See 28 U.S.C. § 1367(c)(3). The judgment of the district court is affirmed.

AFFIRMED.

---

**8.** Plaintiffs submit that the relationship of the mailings and the injury in this case is essentially identical to the relationship found by this court to constitute mail fraud in *Liquid Air Corp. v. Rogers,* 834 F.2d 1297 (7th Cir.1987), *Appley v. West,* 832 F.2d 1021 (7th Cir.1987), and *Schacht v. Brown,* 711 F.2d 1343 (7th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983). In all three cases, assert the plaintiffs, the mails were used not to induce a victim to give up his money but to prevent the detection of the fact that the money or property had been converted. In *Liquid Air,* the defendant's falsified shipping orders kept Liquid Air from noticing the absence of their gas cylinders. In *Appley,* an attorney converted trust funds within his control and rerouted bank statements to himself rather than to the plaintiffs to conceal that conversion. In *Schacht,* the defendant insurance company made false representations to the Department of Insurance to cover up the poor financial condition of the company and the illegal misappropriation of the company's income and assets.

Our examination of the fraud found in each of these cases leads us to conclude that the cases cannot support the plaintiffs' position. The defendants in *Liquid Air* actually falsified the shipping orders in order to retain the missing cylinders. The defendants in *Schacht* mailed fraudulent financial statements that did not disclose the bank's insolvency. The defendant in *Appley* pled guilty to mail fraud; he admitted embezzling plaintiffs' trust funds and causing the monthly bank statements from plaintiffs' bank accounts to be mailed to his own office. Such deliberate falsifications are not anywhere to be found in the case now before us. The plaintiffs have not alleged that the certificates themselves contained untrue information or were fraudulently prepared statements; in fact, at oral argument their appellate counsel agreed with the district court's description that the certificates simply tended to indicate that the insurance company would make a refund. Moreover, the three named plaintiffs who requested the refunds in fact received them. Thus the certificates themselves are not evidence of fraud or of the defendants' intention to defraud; the false shipping orders and financial statements in *Liquid Air* and *Schacht* were such evidence. Nor do we have evidence, as there was in *Appley,* of the defendants' concealment of the plaintiffs' converted assets by deliberate rerouting of the telltale bank statements. In the case before us, there is no contention that the defendants took any action to hide converted funds or to prevent the plaintiffs from finding out about the allegedly misappropriated refunds. When the unearned premiums were sought, they were refunded.